IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Jaki Louise Hawkins, | ) | C/A No.: 1:13-2966-BHH-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.      Relevant Background

        A.      Procedural History

        On October 26, 2010, Plaintiff filed an application for SSI in which she alleged her disability began on December 25, 2009. Tr. at 141–47. Her application was denied initially and upon reconsideration. Tr. at 74–77, 81–82. On July 17, 2012, Plaintiff had a

hearing before Administrative Law Judge ("ALJ") Nicole Forbes-Schmitt. Tr. at 38–65 (Hr'g Tr.). The ALJ issued an unfavorable decision on August 1, 2012, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 18–37. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on October 30, 2013. [Entry #1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 46 years old at the time of the hearing. Tr. at 42. She completed two-and-a-half years of college and obtained a certification in phlebotomy. *Id.* Her past relevant work ("PRW") was as a hotel desk clerk, a foster parent/care attendant, a security guard, and a cashier. Tr. at 61. She alleges she has been unable to work since December 25, 2009. Tr. at 141.

2.    Medical History

On April 3, 2009, Plaintiff presented to Waccamaw Medical Center to establish treatment. Tr. at 287. She indicated that she was previously treated for fibromyalgia for four years by her physician in Pennsylvania. *Id.* Artur Wilkoszewski, M.D., noted tenderness in trigger points in her trunk and extremities, and prescribed Mobic and Darvocet to be taken as needed. Tr. at 288.

Plaintiff presented to William J. O'Connor, M.D., on December 29, 2009, and complained of pain in her neck that radiated down her left arm. Tr. at 280. She also

reported hand numbness upon waking.  *Id.*  Dr. O'Connor noted reduced range of motion in Plaintiff's cervical spine, particularly with extension, bending, and rotation.  Tr. at 281. He assessed cervicalgia, cervical neuritis, and fibromyalgia, and prescribed Lyrica, Cyclobenzaprine, Meloxicam, and Flexeril.  *Id.*

On January 8, 2010, Plaintiff presented to Waccamaw Community Hospital with complaints of neck and left arm pain.  Tr. at 249.  Mild tenderness was noted in her C6-7 region.  Tr. at 250.  An x-ray of Plaintiff's cervical spine indicated cervical spondylosis with developing foraminal encroachment at C4-5 and C5-6.  Tr. at 252.

On February 15, 2010, Plaintiff followed up with Charles P. Busse, M.D., regarding neck pain radiating down her arms.  Tr. at 277.  Dr. Busse observed tenderness in Plaintiff's neck and trapezius muscle.  Tr. at 278.

On July 23, 2010, Plaintiff presented to Lester Brigman, Jr., FNP, and reported right-sided neck pain that radiated down the right side, headache for two to three weeks, and fatigue.  Tr. at 271.  Mr. Brigman observed decreased range of motion in Plaintiff's neck and 4/5 strength in her right upper extremity.  *Id.*  He prescribed Zanaflex and Meloxicam and referred Plaintiff for an MRI.  Tr. at 272.

An MRI of Plaintiff's cervical spine on July 28, 2010, revealed multilevel moderate-to-advanced degenerative disc disease and cervical spondylosis from C2-3 through C6-7; right-sided dominant mild-to-moderate spinal canal stenosis and thecal sac effacement at C4-5, C5-6, and C6-7, all related to advanced chronic degenerative disc disease, disc bulging, and osteophytes; right C6 and right C7 foraminal stenosis due to spondylotic spurring and sclerosis with nerve root compression suspected at the

foraminal levels on the right side; milder degrees of left foraminal stenosis and spondylotic spurring throughout the cervical spine; and right central disc protrusion at C2-3 secondary to chronic disc degenerative changes with no cord deformity or contact. Tr. at 253–54.

Plaintiff presented to Dr. Busse on August 18, 2010, complaining of cervical pain that radiated down her shoulders and upper back. Tr. at 269. Dr. Busse prescribed Tramadol for pain. Tr. at 270.

On October 18, 2010, Plaintiff was seen by Christine M. McGinley, D.O., for cervical disc disease, nausea, and lightheadedness. Tr. at 264–66. She stated that she was disoriented at times. Tr. at 264. She indicated that her neck pain radiated to the back of her head and arms and that physical therapy had not improved her symptoms. *Id.* Dr. McGinley indicated no abnormalities on physical examination. Tr. at 265. Dr. McGinley prescribed Paxil for anxiety, Antivert for dizziness, and Flexeril and Meloxicam for neck pain. Tr. at 266.

On December 1, 2010, Plaintiff presented to Dr. McGinley for a four-week follow up and results of her CT scan. Tr. at 258–61. Plaintiff reported that she was experiencing several episodes of dizziness daily that each lasted for about a minute. Tr. at 258. Dr. McGinley noted no abnormalities upon examination. Tr. at 259. Plaintiff's CT scan and lab results were normal. Tr. at 260. Dr. McGinley indicated that Plaintiff's dizziness may be caused by her neck problems or that they may be a side effect of Lyrica. *Id.* She advised Plaintiff to discontinue Lyrica and to decrease her dosage of Flexeril to reduce drowsiness. *Id.*

4

Plaintiff presented to Dr. McGinley on January 12, 2011, requesting that paperwork be completed because she was unable to work to repay a student loan. Tr. at 328. Plaintiff indicated that her dizziness improved upon stopping Lyrica, but that she had a recent flare of severe neck pain. *Id.* Dr. McGinley discontinued Mobic and prescribed Lodine. Tr. at 329. Dr. McGinley indicated that she could not complete the paperwork for Plaintiff because she was unwilling to indicate that she was permanently disabled and unable to do any job. *Id.*

On February 28, 2011, an MRI of Plaintiff's cervical spine showed right lateral disc herniation at C6-7 with spinal stenosis and significant effacement of the cord and large central disc herniations at C4-5 and C5-6, causing spinal stenosis and effacement of the cord. Tr. at 298. Nerve conduction studies of Plaintiff's bilateral upper extremities that were performed on the same date indicated right median neuropathy at the wrist consistent with mild carpal tunnel syndrome and borderline left median neuropathy at the wrist. Tr. at 299.

On March 15, 2011, Plaintiff presented to consultative physician John V. Custer, M.D., for a mental status examination. Tr. at 301–03. Plaintiff indicated that she rarely visited places alone and that she had not left her home alone in the six months before Dr. Custer's examination. Tr. at 301. She said she had difficulty being in crowds and had recently dropped out of school because of her anxiety. *Id.* Dr. Custer noted that Plaintiff demonstrated no pain behaviors; that she was alert and fully oriented; that she was able to remember three items immediately and after a delay; that she was able to spell "world" forwards and backwards; that she could follow a three-step command; and that she scored

29 of a possible 30 points on the Mini-Mental Status Examination.  Tr. at 302–03.  Dr. Custer assessed possible agoraphobia without panic attacks and pain disorder associated with psychological factors and a medical condition. Tr. at 303.  Dr. Custer further noted that "[t]here was no evidence of attention or concentration problems during this exam." *Id.*

On March 28, 2011, Plaintiff visited Walter James Evans, M.D., with complaints of cervical radiculopathy, numbness, and memory loss.  Tr. at 304–05.  Dr. Evans prescribed a B12 supplement and referred Plaintiff for cervical epidural steroid injection. Tr. at 304.

Plaintiff followed up with Dr. McGinley on April 4, 2011, for medication refills and a B12 injection.  Tr. at 331–33.  Plaintiff reported that her depression had improved. Tr. at 331.  Dr. McGinley noted no abnormalities upon examination.  Tr. at 332.

State agency consultant Lisa Varner, Ph.D., completed a psychiatric review technique on April 7, 2011, and indicated that she considered possible agoraphobia without panic attacks and pain disorder; that Plaintiff's psychiatric impairments were not severe; and that she had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace.  Tr. at 311–16.

Also on April 7, 2011, state agency medical consultant Jim Liao, M.D., completed a physical residual functional capacity ("RFC") assessment in which he indicated that Plaintiff was limited as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of about six

hours in an eight-hour day; sit (with normal breaks) for a total of about six hours in an eight-hour workday; unlimited pushing/pulling; frequently climb ramps/stairs, balance, stoop, kneel, and crouch; occasionally climb ladders/ropes/scaffolds; occasionally crawl; frequently reach; frequently handle (gross manipulation); and avoid heights and hazards. Tr. at 321–25.

On May 23, 2011, Dr. McGinley[1] completed a form in which she indicated that Plaintiff had diagnoses of anxiety and depression; that she was prescribed Paxil; that her medication helped her condition; that her mental status was normal; and that she had no work-related limitation in function due to her mental condition. Tr. at 343.

On June 8, 2011, state agency consultant Holly Hadley, Psy.D., completed a psychiatric review technique in which she indicated that Plaintiff's mental impairments were not severe; that her impairments included depression, anxiety, possible agoraphobia without panic attacks, and pain disorder; and that she had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. Tr. at 344–54.

On July 5, 2011, Plaintiff saw Dr. McGinley for anxiety and dizziness. Tr. at 370–71. She stated that she could not sit up for long periods of time, that she felt pressure in her head, that she was forgetful, and that she was experiencing depression. Tr. at 370. She complained of dizziness and near syncope that occurred daily for several months. *Id.* She indicated that she was experiencing numbness and weakness in her hands and that

---

[1] The physician's signature is illegible, but the undersigned assumes that Dr. McGinley completed the form based upon the fact that the form was addressed to Little River Medical Center and that Dr. McGinley was the only doctor Plaintiff saw at that facility.

she was dropping things. *Id.* She reported crying for no reason over several hours on some days. *Id.* Dr. McGinley ordered a carotid ultrasound and an MRI of the brain, rechecked her B12 levels, referred her to a neurologist, and increased her dosage of Paxil. Tr. at 371. An MRI of her brain and a carotid ultrasound were normal. Tr. at 367, 371.

On August 16, 2011, Plaintiff reported to Dr. McGinley that her neuropathy and dizziness had improved with medications. Tr. at 372. She indicated that she was feeling tired or poorly and that she had swelling localized to one or more joints. *Id.*

On October 18, 2011, Plaintiff reported to Dr. McGinley that she was experiencing lightheadedness and requested prescriptions for a cane and Antivert. Tr. at 387–89. Dr. McGinley refilled Plaintiff's medications and prescribed a three-prong cane. Tr. at 389.

On April 3, 2012, Plaintiff requested that Dr. McGinley prescribe generic medications because she had recently lost Medicaid coverage and could not afford non-generic medications. Tr. at 383. She indicated that her dizziness improved with Antivert. *Id.*

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on July 17, 2012, Plaintiff testified that she was 46 years old and she had completed two-and-a-half years of college. Tr. at 42. Plaintiff indicated that she worked as a cashier in a cigarette shop, a foster parent and a caregiver in group homes, a prison guard, a hospital security guard, and a front desk clerk in a resort. Tr. at 43–45.

Plaintiff testified she was unable to work due to degenerative disc disease in her neck and pinched nerves that affected her ability to control her hands.  Tr. at 46.  Plaintiff stated she had difficulty standing or sitting for extended periods and that she typically sat in a recliner at home.  *Id.*  She stated she had difficulty putting her key in a keyhole and that she frequently dropped things as a result of her hand problems.  *Id.*

Plaintiff testified that she frequently forgot things and became confused.  Tr. at 46–47.  She indicated that she was prescribed a three-prong cane, but that she did not bring it with her to her hearing because she was able to lean on her daughter.  Tr. at 47.  Plaintiff testified that she used the cane mainly because of her lightheadedness.  Tr. at 54.

Plaintiff indicated that she experienced dizziness several times per day, and had experienced a feeling of dizziness and lightheadedness for "years," but that it did not affect her ability to work until two-and-a-half years earlier.  Tr. at 47–48.  Plaintiff indicated that she was prescribed Antivert and that it sometimes helped her dizziness, but sometimes did not.  Tr. at 48.  Plaintiff testified that she continued to drive and that she did not experience dizziness when sitting.  *Id.*

Plaintiff testified that she had problems with depression and anxiety, but she had not seen a psychologist or psychiatrist other than the consultative psychologist who examined her for her social security claim.  Tr. at 49.  Plaintiff stated that she experienced panic attacks approximately once a week.  Tr. 55.  She indicated that her symptoms of depression were well-controlled when she was on medication.  Tr. at 56.

Plaintiff testified that she experienced pain in her shoulder and through the right side of her neck.  *Id.*  She stated that the pain in her neck was a constant dull ache that

was exacerbated by cleaning dishes and vacuuming. Tr. at 50. Plaintiff testified that her neck pain radiated through her arms and that she felt a pins-and-needles sensation in her hands. Tr. at 50–51. She indicated that she had sustained burns to her hands because of the numbness. Tr. at 51. Plaintiff stated that she noticed numbness in her hands three or four times a day and that she had problems handling keys, dishes, and jars. Tr. at 53–54.

Plaintiff testified that one of her medications caused stomach upset. Tr. at 52.

Plaintiff testified that she had been diagnosed with fibromyalgia and that she experienced muscle pain in her legs and in her left arm. Tr. at 54. Plaintiff also testified that she experienced pain to touch on some days. *Id.*

Plaintiff testified that she could sit for 20 minutes at a time. Tr. at 49. She stated that she could stand for approximately 20 minutes at a time before experiencing pain and pressure through her neck, shoulders, and low back. Tr. at 58. Plaintiff indicated that she could lift 10 to 15 pounds. Tr. at 59.

Plaintiff testified that she would have difficulty performing a job that required that she lift no more than 10 to 15 pounds and that allowed for her to alternate between sitting and standing approximately every 20 minutes. *Id.* She indicated that pain and difficulty keeping things in her hands would affect her ability to perform such a job. Tr. at 60.

b.    Vocational Expert Testimony

Vocational Expert ("VE") Robert Gravum reviewed the record and testified at the hearing. Tr. at 60–64. The VE categorized Plaintiff's PRW as a hotel desk clerk, *Dictionary of Occupational Titles* ("*DOT*") number 238.367-038, which was light with a Specific Vocational Preparation ("SVP") of 4; as a foster parent or care attendant, *DOT*

number 359.677-018, which was light with a SVP of 4; as a security guard, *DOT* number 372.667-034, which was light with a SVP of 3; and as a cashier, *DOT* number 211.462-014, which was light with a SVP of 3.  Tr. at 61–62.  The ALJ asked the VE to assume a hypothetical individual with Plaintiff's vocational profile who was limited to a light residual functional capacity; could never climb ladders, ropes, or scaffolds; could occasionally stoop, crouch, and crawl; could occasionally reach overhead; could frequently push, pull, and perform fine and gross manipulation; could never balance; and who must avoid workplace hazards.  Tr. at 62.  The VE testified that the individual could perform all of Plaintiff's past work.  *Id.*  The ALJ then asked the VE to assume that the individual would need to use a cane for both balancing and ambulation and asked if the additional limitation would affect the individual's ability to perform Plaintiff's past work.  *Id.*  The VE indicated that all of the jobs identified would require standing for the majority of the day, but that the desk clerk and the foster parent jobs would be the least limited by that restriction.  Tr. at 62–63.  He indicated that some cashier positions would allow for that type of restriction and some would not.  Tr. at 63.  He indicated that the security guard position would be eliminated.  *Id.*  The ALJ asked if there would be a "drastic reduction" in the number of jobs that would be available."  *Id.*  The VE indicated that there would be a reduction, but that it "would not necessarily be drastic."  *Id.*

Plaintiff's attorney asked the VE to assume the same individual described in the earlier hypothetical, but to assume that Plaintiff's testimony indicating that she would need to recline for three hours per day was credible.  Tr. at 63.  Plaintiff's attorney asked

if there would be any jobs available.  Tr. at 64.  The VE indicated that there would be no

jobs.  *Id.*

> 2.    The ALJ's Findings

In her decision dated August 1, 2012, the ALJ made the following findings of fact

and conclusions of law:

> 1.    The claimant has not engaged in substantial gainful activity since October
>        12, 2010, the application date (20 C.F.R. § 416.971 *et seq.*).
> 2.    The claimant has the following severe impairments: degenerative disc
>        disease of the cervical spine, bilateral carpal tunnel syndrome, and vitamin
>        B12 deficiency with dizziness. (20 C.F.R. § 416.920(c)).
> 3.    The claimant does not have an impairment or combination of impairments
>        that meets or medically equals one of the listed impairments in 20 CFR Part
>        404, Subpart P, Appendix 1 (20 CFR §§ 416.920(d), 416.925 and 416.926).
> 4.    After careful consideration of the entire record, I find that the claimant has
>        the residual functional capacity to perform light work as defined in 20
>        C.F.R. §416.967(b) except she can never climb ladders, ropes, or scaffolds
>        and can never balance.  She can occasionally stoop, crouch, crawl, and
>        reach overhead.   The claimant can frequently use her bilateral upper
>        extremities for pushing, pulling, and fine and gross manipulations.  She
>        requires the use of a cane for ambulation and balance and must avoid
>        workplace hazards.
> 5.    The claimant is capable of performing past relevant work as a cashier,
>        clerk, and care attendant.  This work does not require the performance of
>        work-related activities precluded by the claimant's residual functional
>        capacity (20 C.F.R. § 416.965).
> 6.    The claimant has not been under a disability, as defined in the Social
>        Security Act, since October 12, 2010, the date the application was filed (20
>        C.F.R. § 416.920(f)).

Tr. at 23–33.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

> 1)    The ALJ failed to properly analyze Plaintiff's past relevant work ("PRW");

2)    The ALJ failed to recognize or resolve inconsistencies between the VE's testimony and the *DOT*; and

3)    The ALJ failed to adequately explain her finding's regarding Plaintiff's RFC.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is

15

supported by substantial evidence.  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational.  *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision."  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Analysis of PRW

Plaintiff argues that the ALJ failed to consider her PRW based on the requirements of SSR 82-62, 20 C.F.R. § 404.1520, and Fourth Circuit Precedent.  [Entry #20 at 15]. Plaintiff argues that the evidence demonstrates that she was unable to perform her PRW, and that the ALJ erred in failing to proceed to step five of the sequential evaluation process.  *Id.*  Plaintiff argues that the ALJ summarily concluded that she could return to PRW without assessing the physical and mental demands of her PRW.  [Entry #20 at 17]. Plaintiff specifically notes that the ALJ failed to discuss the ramifications of her need for a three-prong cane on her ability to perform her PRW, which involved standing for the majority of the day.  *Id.*

The Commissioner argues that the ALJ's decision contains descriptions and *DOT* numbers for Plaintiff's PRW that satisfy the findings required by SSR 82-62.  [Entry #24

at 6]. The Commissioner argues that Plaintiff fails to explain how the ALJ's alleged error affected the ALJ's decision that she could perform her PRW. [Entry #24 at 7].

Pursuant to 20 C.F.R. §§ 404.1520(a)(4)(iv) and 416.920(a)(4)(iv), "[i]f you can still do your past relevant work, we will find that you are not disabled." SSR 82-62 sets forth the procedures the Social Security Administration ("SSA") uses at step four of the sequential analysis when determining whether the claimant's RFC permits her to return to her PRW. The ALJ must consider whether a claimant has the RFC to "meet the physical and mental demands of jobs a claimant has performed in the past (either the specific job a claimant performed or the same kind of work as it is customarily performed throughout the economy)," and, if the claimant can return to her PRW, she may be found "not disabled." SSR 82-62. The Ruling provides the following detail regarding what an ALJ is to include in her decision:

> Determination of the claimant's ability to do PRW requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the *Dictionary of Occupational Titles*, etc., on the requirements of the work as generally performed in the economy.
>
> The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision. Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit.

*Id.*  Further, SSR 82-62 requires the following when the decision-maker determines that a claimant can meet the physical and mental demands of PRW:

> The rationale for a disability decision must be written so that a clear picture of the case can be obtained.  The rationale must follow an orderly pattern and show clearly how specific evidence leads to a conclusion.

> * * *

> In finding that an individual has the capacity to perform a past relevant job, the determination or decision must contain among the findings the following specific findings of fact:

> 1.    A finding of fact as to the individual's RFC.
> 2.    A finding of fact as to the physical and mental demands of the past job/occupation.
> 3.    A finding of fact that the individual's RFC would permit a return to his or her past job or occupation.

*Id.*

> The ALJ concluded that Plaintiff could perform her PRW:

> In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as actually and generally performed.  The vocational expert specifically testified that an individual of the claimant's age, work experience, education and residual functional capacity could perform work as a cashier (*DOT* #211.462-014, light exertional level, SVP 3), hotel desk clerk (*DOT* #238.367-038, light exertional level, SVP 4), care attendant/ foster parent (*DOT* #359.677-018, light exertional level, SVP 4).  The vocational expert also testified that the limitations as described would not significantly reduce the numbers of these jobs available.

Tr. at 33.

A review of the record indicates that Plaintiff completed a work history report in which she reported that she had to lift up to 20 pounds and stand, walk, reach, and handle "all day" in her PRW as a care attendant/foster parent.  Tr. at 184–85.  She also indicated

that she had to lift less than 10 pounds and stand, sit, reach, and write, type, or handle small objects for eight hours in her job as a hotel desk clerk.  Tr. at 186.  Plaintiff did not provide any information about the job as the cashier in the work history report.  Tr. at 181–88.  During her testimony, Plaintiff was not questioned about how her PRW was performed.  *See* Tr. at 42–60.

The undersigned has reviewed the *DOT*'s description for the jobs of cashier (*DOT* number 211.462-014), hotel desk clerk (*DOT* number 238.367-038), and care attendant/foster parent (*DOT* number 359.677-018).  Cashier-checker is identified in the *DOT* as light work that requires the highest degree of motor coordination and constant reaching, handling, and fingering.  *Dictionary of Occupational Titles, 4th ed.*, 211.462-014. 1991 WL 671841.  Hotel clerk is identified in the *DOT* as light work that requires the lowest level of motor coordination, occasional reaching and handling, and frequent fingering.  *Dictionary of Occupational Titles, 4th ed.*, 238.367-038. 1991 WL 672211. Care attendant/foster[4] parent is identified in the *DOT* as light work that requires a low level of motor coordination, occasional fingering, and frequent reaching and handling. *Dictionary of Occupational Titles, 4th ed.*, 359.677-018. 1991 WL 672970.

The undersigned recommends a finding that the ALJ erred in failing to address conflicts between Plaintiff's PRW as actually performed and as described in the *DOT*, but that this error was harmless.  Despite her indication that Plaintiff could perform PRW as actually and generally performed, the ALJ failed to question the VE as to whether there were any conflicts between the jobs as described by Plaintiff and the description in the

---

[4] The job title corresponding to *DOT* number 359.677-018 is "nursery school attendant."

*DOT.  See* Tr. at 61–62.  A comparison of Plaintiff's work history report and the *DOT*'s descriptions of her past work suggest some inconsistencies between the jobs as described by Plaintiff and the *DOT*'s descriptions.  However, because a claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work, the ALJ would have reached the same conclusion even if she had concluded that Plaintiff could not perform her PRW as actually performed.  *See* SSR 82-62; 20 C.F.R. Subpart P, § 404.1520(a), (b).  Therefore, the undersigned recommends that the ALJ's error be deemed harmless.  *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (finding that where the ALJ conducted the proper analysis, cited substantial evidence to support his finding, and would have reached the same conclusion notwithstanding his initial error, the error was harmless).

The undersigned further recommends a finding that the ALJ complied with the requirements of SSR 82-62 in determining that Plaintiff was able to perform her PRW.  The ALJ's decision followed an orderly pattern and she explained how specific evidence led to her conclusion.  The ALJ considered Plaintiff's statements as to which past work requirements could no longer be met and the reasons her for inability to meet those requirements, but she determined that Plaintiff's statements were inconsistent with the evidence.  *See* Tr. at 26–28.  The ALJ also considered medical evidence establishing how Plaintiff's impairments limited her ability to meet the physical and mental requirements of the work, and specifically noted that in determining Plaintiff's RFC, she restricted her to jobs that precluded balancing and allowed for the use of a cane.  *See* Tr. at 32.  The

ALJ relied on vocational information in the form of VE testimony and citations to the *DOT*. *See* Tr. at 33. Because the ALJ questioned the VE about the implications of use of a cane on an individual's ability to perform Plaintiff's PRW and based her determination on the VE's response, it is apparent that she considered Plaintiff's need to use a three-prong cane. See *Id*. The ALJ made a finding of fact as to Plaintiff's RFC, made a finding of fact as to the physical and mental demands of her PRW (based on descriptions from the *DOT* and VE testimony), and made a finding of fact that her RFC would permit a return to her PRW. *See* Tr. at 26, 33. Therefore, the undersigned recommends a finding that the ALJ complied with SSR 82-62.

Plaintiff further argues that the ALJ mischaracterized the VE's testimony regarding a reduction in the number of jobs available. [Entry #20 at 18]. The pertinent exchange is as follows:

> ALJ: And then with the additional restriction of having to use a cane for both balancing and ambulation, would that affect any of the past jobs?
>
> VE: Judge, the jobs are all light-duty work, which by definition would require standing for the majority of the day. The desk clerk would—and the foster parent would each be the least limited by that additional—or the additional limitation. The cashier position could in some settings allow for that type of restriction. In some settings, it would not. The security guard would likely be eliminated.
>
>                         * * *
>
> ALJ: Okay. And would there be a drastic reduction in the number of jobs that would still be available?
>
> VE:    There would be a reduction. It would not necessarily be drastic.

Tr. at 62–63.

21

The undersigned recommends a finding that the ALJ did not mischaracterize the VE's testimony regarding a reduction in jobs due to a restriction for use of a cane for balancing and ambulation. The ALJ's indication that the identified restrictions "would not significantly reduce the number" of jobs available is generally consistent with the VE's indication that a reduction "would not necessarily be drastic." However, the undersigned notes that it would be better practice for the ALJ to ascertain quantifiable information regarding the reduction in jobs imposed by the restrictions.

2.    Inconsistencies Between VE Testimony and the *DOT*

Plaintiff argues that the VE's testimony is inconsistent with the *DOT*, and that the ALJ failed to recognize or resolve the inconsistencies. [Entry #20 at 19]. Plaintiff indicates that, while the ALJ specified in her decision that the VE's testimony was consistent with the *DOT*, the ALJ never asked if his testimony was consistent with the *DOT* and the VE never confirmed that his testimony was consistent with the *DOT*. [Entry #20 at 21].

The Commissioner argues that there is no conflict between the VE's testimony and the *DOT* because the *DOT* does not mention the use of assistive devices. [Entry #25 at 8]. The Commissioner argues that the ALJ's failure to question the VE regarding conflicts between his testimony and the *DOT* was harmless because there was no conflict. [Entry #24 at 9].

The provisions of 20 C.F.R. §§ 404.1566(d) and 416.966(d) provide that the ALJ should take administrative notice of job information contained in the *DOT*. Furthermore, SSR 00-4p indicates that "we rely primarily on the *DOT* (including its companion

publication, the SCO) for information about the requirements of work in the national economy." In some cases, ALJs call upon the services of a VE to address how certain restrictions affect a claimant's ability to perform specific jobs. 20 C.F.R. §§ 404.1566(e), 416.966(e). Because the opinions of VEs sometimes conflict with the information contained in the *DOT*, the SSA promulgated SSR 00-4p to explain how these conflicts should be resolved.

Pursuant to SSR 00-4p, before relying on VE evidence to support a disability decision, the ALJ must "identify and obtain a reasonable explanation for any conflicts between occupational evidence" in the *DOT* and in its companion publication, the *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* ("SCO"), and explain in the determination or decision how any conflict that has been identified was resolved. The ALJ has an affirmative responsibility to ask about any possible conflict between the VE testimony and the information provided in the *DOT*. SSR 00-4p.

The ALJ indicated that Plaintiff had the RFC to perform light work with the additional restrictions set forth above. Light work is defined in 20 C.F.R. § 404.1567(b), as involving lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds and requiring either a good deal of walking or standing or sitting most of the time with some pushing and pulling of arm or leg controls. Greater detail regarding the specific requirements of Plaintiff's PRW is set forth in Section II(B)(1) of this Report.

The ALJ indicated that "[p]ursuant to 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles."  Tr. at 33.

The undersigned is constrained to recommend a finding that the ALJ failed to comply with the requirements of SSR 00-4p.  In spite of the ALJ's indication that the VE's testimony was consistent with the *DOT*, the undersigned's review of the transcript reveals that the ALJ failed to question the VE regarding any possible conflicts with the *DOT*.  While the Commissioner is correct that the *DOT* does not mention the use of assistive devices, it does indicate the physical demand requirements, the motor coordination requirements, and the frequency that the hands are used in each job. Therefore, it is reasonable to assume that there is an inherent conflict between the *DOT* and the VE's testimony where the ALJ provides for use of a cane for ambulation and balance and the VE identifies a job or jobs that require standing or walking to a significant degree and frequent use of the bilateral hands.  The undersigned posits that to maintain balance while standing, the individual would need to place one hand on the cane.  This would only allow the individual to perform manual tasks with one hand and is inconsistent with performance of any job that requires use of the bilateral hands for up to two-thirds of the workday.  The undersigned concedes that the VE did indicate to some extent that his testimony conflicted with the *DOT* when he stated "the jobs are all light-duty work, which by definition would require standing for the majority of the day."  *See* Tr. at 62.  However, because the VE failed to explain the basis for his opinion and because the ALJ failed to acknowledge the conflict, remand is appropriate.

In addition, the undersigned's review of the job description for cashier-checker, *DOT* number 211.462-014, reveals an indication that the job requires constant reaching, handling, and fingering.  In light of the ALJ's indication that the hypothetical individual was limited to frequent use of the bilateral upper extremities for pushing, pulling, and fine and gross manipulations, there is an obvious conflict between the restrictions set forth in the RFC, the description of this job in the *DOT*, and the VE's testimony.

The undersigned's recommendation should not be construed to mean that Plaintiff was unable to perform the jobs that the VE identified.  Upon remand, the undersigned recommends that the ALJ solicit the assistance of a VE to explain any inconsistencies between Plaintiff's assessed RFC and the vocational evidence and authorities.

### 3.     Explanation of RFC Findings

Plaintiff argues that the ALJ erred in failing to explain her findings regarding her RFC assessment, as required by SSR 96-8p.  [Entry #20 at 22].  Plaintiff argues that the ALJ erred in determining that her manipulative limitations were not significant.  [Entry #20 at 23].

The Commissioner argues that the ALJ was only required to incorporate in the RFC assessment those limitations that were supported in the record.  [Entry #24 at 9].  The Commissioner concedes that the record supports diagnoses of carpal tunnel syndrome and degenerative disc disease with cervical radiculopathy, but argues that the record does not indicate that Plaintiff's impairments prevented her from handling and fingering objects on a frequent basis.  *Id.*

The ALJ's RFC assessment should be based on all the relevant evidence. 20 C.F.R § 404.1545(a). SSR 96-8p requires that the RFC assessment "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p. The RFC must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . ." *Id.* The ALJ must discuss the claimant's ability to work in an ordinary work setting on a regular work schedule. *Id.*

The ALJ indicated that she considered whether Plaintiff's carpal tunnel syndrome met Listing 11.14 or any other neurological disorder of Listing 11.00, but determined that the medical records did not demonstrate that Plaintiff's impairment met the level of severity required in the Listings. Tr. at 25. The ALJ indicated that she accorded great weight to the opinion of the state agency consultant who conducted a physical RFC assessment in April 2011 and restricted Plaintiff to frequent, rather than constant, reaching in all directions and handling with both hands. Tr. at 32. She also indicated that she accorded considerable weight to the state agency consultant who conducted a physical RFC assessment in June 2011 and limited Plaintiff to frequent, rather than constant, reaching in all directions, handling (gross manipulation), and fingering (fine manipulation) with both hands. *Id.*

The undersigned recommends a finding that the ALJ adequately considered the effects of Plaintiff's cervical degenerative disc disease and carpal tunnel syndrome on her ability to use her bilateral upper extremities to perform work activity. The ALJ explicitly

26

considered Plaintiff's testimony and function reports in which she indicated problems with her bilateral hands. *See* Tr. at 26–27 ("frequently dropped things and had numbness in her hands," "trouble washing and caring for her hair," "could crochet twice a week for 15 minutes at a time," "intermittent weakness and pins and needles in her hands," "able to pick up change, but had a harder time holding on to large objects," "had to use her left hand when cooking, especially when lifting heavy baking dishes from the oven," "did not believe she would ever be able to do phlebotomy due to her intermittent upper extremity weakness and unexpectedly dropping things," worsened "hand and arm numbness," "sometimes . . . could not grasp a pen or pencil," "required assistance to tie her shoes, vacuum, and lift the laundry," "trouble buttoning clothes," "trouble putting a key in a keyhole," and has "burned herself" due to numbness in her hands). However, the ALJ determined that Plaintiff's statements were inconsistent with physical examinations, a history of infrequent and conservative treatment, reports of improved symptoms when taking medication as prescribed, and a lack of medical restrictions imposed by her treating physicians. *See* Tr. at 28. She discussed specific treatment records, including Plaintiff's complaints to her treating physicians and their objective findings. *See* Tr. at 29–31. She specifically considered the limitations set forth by the state agency medical consultants who reviewed Plaintiff's records and gave them considerable weight. Tr. at 32. These physicians restricted Plaintiff to frequent use of her bilateral upper extremities after reviewing the evidence in the record, including Plaintiff's complaints and the objective findings. *See Id.* Plaintiff only complained to her physician of a problem with her bilateral upper extremities once after these assessments were completed. *See* Tr. at

27

370.  Therefore, it was reasonable for the ALJ to accept the limitations identified by the state agency medical consultants regarding the effects of degenerative disc disease of the cervical spine and bilateral carpal tunnel syndrome on Plaintiff's ability to use her bilateral hands where the ALJ determined that Plaintiff's testimony was not entirely credible and where there was no other evidence to suggest a greater level of impairment.

## III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law.  Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence.  Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

October 9, 2014                                    Shiva V. Hodges
Columbia, South Carolina                  United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).